IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| RONNIE D RAMAGE, | : | |
| Plaintiff, | : | |
| v. | : | No. 5:15-cv-00296-CAR-CHW |
| CAROLYN W. COLVIN, | : | Social Security Appeal |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Ronnie D. Ramage's application for benefits. 42 U.S.C. Section 405(g). Because the Commissioner's decision is not supported by substantial evidence, it is **RECOMMENDED** that this case be **REMANDED** pursuant to "sentence four."

## BACKGROUND

Plaintiff Ronnie Ramage filed an application for disability benefits on September 20, 2011, alleging impairment due to back and ankle problems. (R. 101). Plaintiff was assessed as having unspecified athropathies, dysfunction of major joints, affective disorders, and substance addiction, but his application was denied initially and on reconsideration. (R. 106 – 107, 118 - 119). Plaintiff appealed and a hearing was held in front of Kelly Wilson, an administrative law judge (ALJ), on October 11, 2013. (R. 37). The ALJ issued a decision denying Plaintiff's appeal on January 31, 2014. (R. 19 - 30), which was affirmed by the Administrative Appeal council on June 7, 2015. (R. 1). Plaintiff now appeals to this Court.

1

**STANDARD OF REVIEW**

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

**EVALUATION OF DISABILITY**

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience."

*Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## THE MEDICAL RECORD

The medical and opinion record in this case consists of the following. Plaintiff's initial evaluation and reconsideration (R. 106 – 107, 118 - 119), the Administrative Hearing (R. 93 – 100, 185 - 201), various disability reports, function reports, and questionnaires (R. 266 – 343, 344 - 358), an Independent Medical Evaluation authorized by the Office of Disability Determinations (R. 380 – 386), a Disability Determination Examination (R. 435 – 441), a Confidential Psychological Assessment performed by Duane Al Harris, Ph.D. (R. 446 – 451), medical records from Orlando Diagnostic Center (R. 389 – 391), Batson Family Health (R. 393 – 406), John E. Polk Correction Facility Inmate Health Care Services (R. 417 – 429), Medical Center of Central Georgia (R. 456 – 478), and Cyler Garner, M.D. (R. 481 – 495).

The medical record in this case begins on February 3, 2010, when Plaintiff was evaluated by Dr. Alvan Barber, M.D., in anticipation of Florida state disability review. (R. 380). Plaintiff reported a damaged left ankle, inability to walk, and right hip morbidity. *Id*. The self-reported source of Plaintiff's ankle condition was a 1991 three story fall resulting in a compound fracture to Plaintiff's left ankle and multiple surgeries, including surgical intervention following the onset of gangrene during Plaintiff's initial recovery. (R. 380 – 381). Since that time, Plaintiff has suffered from ankle pain, difficulty walking and standing, as well as an ankle that is turned inward and "fused to itself." The Source of Plaintiff's hip pain dates to 1989 when Plaintiff was in a motorcycle accident and fractured his right pubic bone. It is unclear whether the residual effects of Plaintiff's 1989 hip fracture contributed to his fall in 1991. *Id*.

Dr. Barber performed a physical exam of Plaintiff physical that showed general weakness as well as muscle and joint pain and discomfort. *Id*. Plaintiff's upper extremities, neck, chest, and abdomen were normal. (R. 382 – 83). The examination showed extensive scarring and deformity in Plaintiff's fused ankle with atrophy throughout and limited rotation. Plaintiff's muscle strength was normal for his right lower extremity, but both his dorsi and plantar flexion were rated as 0/5 for his left leg. (R. 383). Plaintiff walked with a limp, could not walk on his toes or heels and was unable to squat. Plaintiff also suffered from low paravertebral muscle spasms, positive point tenderness, and experienced pain during range of motion. (R. 383). Dr. Barber opined that Plaintiff cannot walk or stand for long periods, can sit for reasonable periods, cannot kneel, crawl, or squat, and can use his upper body. (R. 384).

Plaintiff's primary care physician is Charles Batson, M.D., and the first available treatment record from Dr. Batson is dated January 2011. (R. 393) Plaintiff's treatment with Dr. Batson focused on ankle enthesopathy, crushing back injury, sciatica, and ankyloses. (R. 392). Plaintiff primarily sought relief for his pain, and was prescribed ibuprofen, Flexeril, and Ultracet (R. 393). Plaintiff reported that these medications were not effective, but Dr. Batson declined to prescribe Plaintiff an alternative. (R. 393). At a prior visit, Plaintiff had been prescribed Lorcet Plus. (R. 399). Dr. Batson saw "no observable abnormalities" and noted that Plaintiff had normal gait and balance, and reported pain (R. 403). Doctor Batson referred Plaintiff to an orthopedist for specialized treatment of his ankle injury and for a bulging disk in his lumbar spine. (R. 406). Imaging was obtained in February of 2011, which showed multiple old fractures, degenerative changes of the subtalar joints, and fusion of Plaintiff's ankle joint. (R. 389). Imaging of Plaintiff's spine showed L1-L2 disc bulge with bilateral neural foramina narrowing, L2-L3 diffuse circumferential disc bulge "with facet arthopathy narrows the bilateral neural foramina,"

4

L5-S1 diffuse disc bulge with epidural fat displacing and compressing nerve root and bilateral neural foramina stenosis. (R. 391). It was believed that muscular spasms may be causing a curvature of Plaintiff's lumbar spine. (R. 391). Plaintiff was diagnosed with a prior crushing injury to his back. (R. 403). In March of 2011, Plaintiff was seen at the Apex Pain Management Clinic, but was denied treatment at that time because Dr. Batson had not provided the clinic with Plaintiff's medical records. (R. 411).

The next available records are a timeline from the John E Polk Correctional Facility that show Plaintiff was treated at the institution's Inmate Health Care Services Clinic in October 2011. (R. 429). The record does not indicate when Plaintiff entered the county jail, but Plaintiff's last treatment with Dr. Batson was on October 11, 2011, and outside treatments did not resume until August 4, 2012 when Plaintiff was examined by Dr. Alton Greene. At the correctional facility, Plaintiff sought treatment for muscle spasms and chronic pain and listed his medications as oxycodone and valium. (R. 428). Plaintiff was placed on a low level/bunk profile and may have been prescribed medications. (R. 426). On October 20, 2011, Plaintiff fell in court due to pain and involuntary movements. (R. 424). Plaintiff reported withdrawals, terrible pain, bad anxiety and depression. (R. 425). Plaintiff again went to medical on October 22 complaining of back spasms and requested narcotic pain medicine which had apparently been ordered. (R. 423). Notes indicate that he was set to leave the jail on "Monday." *Id*. Despite that note, Plaintiff returned on October 25, 2011, due to a broken filling (R. 421), missed a mental health follow up on the 27th (R. 421), and had a mental health follow-up on the 28th. (R. 417).

Plaintiff was released from the jail on an unknown date. On August 4, 2012, he underwent a "Disability Determination Examination" performed by Doctor Alton Greene. Plaintiff gave a history generally consistent with those previously reported and complained of

5

constant back pain which is exacerbated by walking and relieved by medicine and lying down. Plaintiff also complained of weakness. (R. 435). Plaintiff reported that he was incapable of dressing himself, can stand for only 4-6 minutes at a time and lift up to 15 pounds. (R. 435). The examination revealed that Plaintiff ambulated with an antalgic gait, had zero range of motion in his left ankle, had difficulty balancing on his heels and squatting, could not stand on his toes, and his left calf was 1.5 inches smaller than his right calf. (R. 436). Dr. Greene did not offer a detailed opinion of Plaintiff's functional abilities, but stated that Plaintiff had some physical limitations and noted that Plaintiff did not require an assistive device for ambulation. (R. 440).

On September, 15, 2012, Plaintiff underwent a Psychological Assessment performed by Duane Harris, Ph.D. (R. 446). Plaintiff reported being able to complete most activities of daily living without assistance but needing occasional help with hygiene. (R. 449). Plaintiff occasionally went grocery shopping with his wife to get out of the house and stays in the car while she shops, and Plaintiff no longer went to church because he cannot handle the walking required. (R. 449). Dr. Harris determined that Plaintiff had a moderate level of depression, nicotine dependence, antisocial features, ankle deformity, financial concerns, and a GAF of 60. (R. 451). Plaintiff prognosis was "guarded," and Dr. Harris opined that Plaintiff was capable of understanding detailed instructions and had adequate level of persistence. (R. 451). Plaintiff reported being a self-employed roofer prior to his fall. *Id*.

Beginning in June of 2012, Plaintiff was treated by Dr. Cyler Garner for his left ankle pain, disk bulge, and vertebral compression. (R 495). Plaintiff was initially prescribed valium and Roxicodone by Dr. Garner. (R. 465). This treatment continued through early 2013, and Plaintiff continued to be treated with various narcotic pain medications and anxiety medications

during the duration of his visits. (R. 481 – 494). The purpose of these visits was to monitor his condition and refill his medications.

On February 17, 2013, Plaintiff presented at the hospital with multiple traumas after falling from a roof. (R. 460). Plaintiff had a chest tube inserted due to a collapsed lung, fractured his left and right radius, fractured multiple ribs, and fractured metacarpal bones. (R. 460). The record is inconsistent concerning why Plaintiff was on the roof, but the roof was approximately forty feet high and had one intervening structure between Plaintiff and the ground. (R. 460). Plaintiff's chest tube was removed on the 19th and he underwent surgery to address his left and right factures on the 21st. (R. 460). Plaintiff was discharged the next day. He was advised not to perform any activity, keep his upper extremities elevated, and follow up for pain management as well as well as post-surgery assessments. (R. 461). Following release from the hospital, Plaintiff continued to be regularly treated by Dr. Garner. The incident is noted in Dr. Garner's treatment record from February 25, 2013. (R. 486). While notes indicate that Dr. Garner monitored Plaintiff's splints, bandages, and wounds, the course of treatment did not change. Plaintiff continued to be prescribed Oxycodone and various anxiety medications through July 2013. (R. 481 – 486).

## DISABILITY EVALUATION IN THIS CASE

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since September 20, 2011. (R. 21). At step two, the ALJ found that Plaintiff suffered from the following severe impairments, "degenerative disc disease of the spine, status post fracture of the left ankle with residual limitations, depression, and personality disorder." (R. 21). The ALJ noted that the record did not contain medical evidence regarding

Plaintiff's wrists following his February 2013 fall, noted that there was no evidence that the fractures would not resolve within twelve months, noted Plaintiff's subjective complaints regarding his wrists, and determined that Plaintiff's impairment from the fall was non severe. (R. 21-22). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (R. 22). The ALJ assessed Plaintiff's RFC and determined that Plaintiff has "the residual capacity to perform light work" except he cannot perform any pushing and pulling with his left lower extremity and could only perform "occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs." (R. 24). At step four, the ALJ determined that Plaintiff has no past relevant work. (R. 29). At step five, the ALJ determined that Plaintiff could perform work as a ""garment sorter" and "parking lot attendant." (R. 29). Thus, the ALJ determined that Plaintiff was not disabled from September 19, 2010, to the date of his decision. (R. 30).

## ANALYSIS

Plaintiff argues that he is entitled to have the Commissioner's decision remanded because the ALJ (1) inappropriately assigned minimal weight to Dr. Barber and Dr. Greene, both of whom performed examinations on Plaintiff and (2) the ALJ inappropriately denied Plaintiff's counsel's request for Plaintiff to be examined following his forty-foot fall in 2013. Doc. 12, p. 6. Plaintiff contends that these two errors resulted in an opinion which not only discounted all source opinions that physically examined Plaintiff but also failed to account for significant injuries resulting from the 2013 fall.

a.  *Assignment of Weight*

When evaluating medical opinions, the ALJ must consider multiple factors in determining what weight to afford that opinion. *Flowers v. Commissioner of Social Security*, 441 F. App'x 735, 740 (11th Cir. 2011). These factors include the "examining relationship, the treatment relationship, whether an opinion is amply supported, whether an opinion is consistent with the record, and the doctor's specialization." *Id*.  In general, treating physicians are given the most weight, non-examining physician are given the least weight, and examining physicians lie somewhere in-between. *Id*. (citing 20 C.F.R. 404.1527(d)(1)-(2), 416.927(d)(1)-(2).  This means that a treating physician's opinion must be given substantial weight unless "good cause" is shown to the contrary.  *Crawford v. Comm'r of Soc. Sec*., 363 F.3d 1155, 1159 (11th Cir. 2004). Good cause exists when a doctor's findings are inconsistent with the medical record, not bolstered by the evidence, or where the evidence supports a contrary finding.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

The Eleventh Circuit addresses discrediting the opinion of examining physicians in the context of the "good cause" requirement applicable to treating physicians. See *Russell v. Astrue*, 331 F. App'x 678, 681 (11th Cir. 2009); *Flowers*, 441 F. App'x at 740. As discussed above, examining physician opinions are entitled to less weight than treating physicians. The amount of evidence required to establish "good cause" is proportional to the weight each type of doctor is entitled to. Therefore, an examining physician's opinion is properly discredited by specific, cogent reasons. *Russell*, 331 F. App'x at 681 – 82. An ALJ may "discredit the opinion of an examining or treating physician, so long as the Commissioner 'specif[ies] what weight is given to a treating physician's opinion and any reason for giving it no weight.'" *Id*. (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

In the present case, the ALJ discredited every doctor that provided an opinion regarding Plaintiff's physical abilities. Two doctors in the record both examined Plaintiff and provided an opinion regarding his functional abilities. As discussed above, Dr. Alvan Barber examined Plaintiff on February 3, 2010, and determined that Plaintiff "cannot walk and stand for long periods of time," and "cannot kneel, crawl, or squat" due to a left ankle fracture and complications, a right pubic bone fracture, and low back pain. (R. 384). Dr. Alton Greene examined Plaintiff several years later and concluded that he had "some limitations physically with his gait and objective atrophy and leg-length discrepancy. He does not use an assistive device. He has a fused ankle. He has no manipulative, visual, or communicative limitations." (R. 437). Dr. Green did not otherwise opine about Plaintiff's functional capacities.

The ALJ assigned "minimal weight" to these two doctors because "they are somewhat inconsistent, and because of the vague nature of their functional limitations." (R. 26). The ALJ noted that Dr. Barber placed limitations on Plaintiff's ability to stand and interpreted Dr. Green's examination as not finding "any significant limitations on [Plaintiff's] ability to stand and walk." (R. 26). The ALJ further discredited Plaintiff's subjective reports that he has difficulty with standing and ambulation, and also gave minimal weight to a state agency reviewer that opined Plaintiff could perform medium work. (R. 26). No other doctor assessed Plaintiff's physical capabilities and the ALJ did not assign weight to Plaintiff's treating physicians.

With regard to Plaintiff's mental impairments, the ALJ assigned great weight to Michelle Wierson[1], Ph. D. and Dr. Harris. Dr. Wierson's review of the medical record gave great weight

---

[1] Dr. Wierson's opinion is dated September 27, 2012. The same form contains other state agency review opinions. On August 22, 2012, Dr. Thomas German assessed Plaintiff's RFC without reference to Dr. Barber's evaluation and stated that Plaintiff could walk or stand 6 hours out of eight and sit 6 hours out of eight. (R. 121 - 122). Dr. German determined Plaintiff's statement of limitation to be only partially credible based on his ankle fusion, but failed to state how his degenerative disc disease contributed to his credibility. (R. 125). Dr. German did not have access to significant portions of Plaintiff's record, some of which were requested just prior to his decision or after. (R. 117).

to the "CE provider."[2] (R. 114). The ALJ specifically endorsed Dr. Wierson's opinion because she opined that Plaintiff had only mild limitations in activities of daily living and social functioning.[3] (R. 27). Similarly, while Dr. Harris was generally given great weight, the ALJ specifically endorsed his RFC regarding Plaintiff's capacity for social interaction. (R. 27). However, the two doctors' RFCs are inconsistent. Dr. Harris determined that Plaintiff's ability to interact with others in a work environment is "poor to fair" (R. 451), while Dr. Wierson determined that Plaintiff is not significantly limited in ability to interact with the general public and "can interact appropriately as long as he is sober and chooses to do so." (R. 126). The ALJ apparently resolved the conflict through his RFC by determining that Plaintiff "may work in proximity to others, and interact with others including coworkers and supervisors, but would do best in more solitary work tasks."

Despite the ALJ's stated attribution of great weight to Dr. Harris, this RFC represents Dr. Wierson's opinion and merely acknowledges the limitations Dr. Harris found without actually incorporating them into the RFC. This was error because the opinion of non-examining, reviewing physicians like Dr. Wierson "when contrary to those of examining physicians are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence." *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (citing *Sharfarz v. Bowen*, 825 F. 2d 278, 280 (11th Cir. 1987).

The ALJ discredited all doctors who examined Plaintiff physically and did not assign weight to any treating doctors. The ALJ also did not properly incorporate her attribution of

---

[2] Dr. Wierson's assessment is found on a Disability Determination Explanation form that states "the evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim." (R. 117). It is unclear when this was written or who wrote it.

[3] The ALJ did not resolve the inconsistency in his decision to afford the consultative examiners minimal weight while affording a reviewing physician that relied on the consultative examinations assessment "great weight." Likewise, the ALJ did not explain what it means to give "great weight" to an agency reviewer whose opinion appears on a form that states that the evidence is not sufficient to support a decision.

weight to Dr. Harris into her RFC. Having further discredited Plaintiff's own testimony and reports regarding his physical and mental abilities it is not entirely clear that the ALJ's decision is based on medical evidence rather than the ALJ's own intuition. Notably, the ALJ must have credited some of the physical evidence and opinions in the record because she determined that Plaintiff's atrophied ankle and spinal problem constituted severe impairments, but she fails to give the basis for the detailed findings regarding the physical aspects of Plaintiff's RFC. She found that Dr. Barber and Dr. Green's assessments were too vague to be relied on, she did not attribute weight to Plaintiff's treating physicians, and neither Dr. Wierson nor Dr. Harris addressed Plaintiff's physical impairments. The ALJ's RFC appears to be based on a series of vague negative inferences drawn from credibility findings as well as the proposition that if Plaintiff is not credible in his claims that he cannot work, then he is capable of work. It is not at all clear what medical evidence supported the RFC.

In formulating Plaintiff's RFC, the ALJ did not specifically address several critical aspects of Plaintiff's physical abilities, including how long Plaintiff is able to walk and stand as well as how much he can carry and lift. Where the ALJ did make detailed findings, they are inconsistent with the medical opinions in the record. The ALJ made detailed finding that Plaintiff can balance, stoop[4], kneel, crouch, crawl, and climb of ramps and stairs. This finding is inconsistent with Dr. Barber's determination that Plaintiff cannot kneel, crawl, or squat (R. 380) as well as Dr. Greene's opinion that Plaintiff has difficulty squatting and balancing on his heels. (R.436). The ALJ's RFC determination is not based on substantial evidence and the combination of procedural errors discussed above compounds additional errors discussed below.

---

[4] At the Administrative hearing the ALJ said "I take notice that if you can't stoop, under the regulations, you are disabled." (R. 72).

      b. *Credibility and Plaintiff's Level of Activity*

The ALJ further determined that Dr. Barber's, Dr. Green's, and Plaintiff's self-reported level of activity were inconsistent with the level of activities Plaintiff performs as well as the objective medical evidence. Specifically, the ALJ found Plaintiff's work as a ride operator and roofer incompatible with his alleged level of limitation and his course of treatment for pain incompatible with his alleged levels of pain.

First, with regard to Plaintiff's work as a ride operator, the record does not definitively indicate when the work concluded, how long the work lasted, or what the work consisted of. On Plaintiff's work activity report, dated April 1, 2011, Plaintiff stated he was currently employed as a ride operator for twelve hours a week and the date on which the work ended was "n/e" (R. 311). At $7.25 an hour, Plaintiff did not earn enough monthly income from this job to constitute substantial gainful activity. That same form indicated that Plaintiff had previously worked in the same position for forty hours a week until March 2011. (R. 312). According to a subsequent work history report, up until March 2011 Plaintiff had significantly more duties as a ride operator than he did after April 2011. (R. 328 – 29). Plaintiff stated during his psychological evaluation he worked at a flea market for a while but "he just couldn't do it." (R. 448). Similarly, Plaintiff stated at the administrative hearing that he tried to work at a flea market a couple of years ago but just couldn't do it. (R. 44 – 45). Plaintiff's certified earning reports shows that he earned $7,293.22 in 2011, and earned nothing in both 2012 and 2013. Plaintiff's onset date is April 1, 2011, the same day he decreased his hours from 40 to 12.

Given Plaintiff's repeated statements that he attempted to work as a ride operator but was unable to, as well as his certified earning statements, it is not clear that Plaintiff actually performed this work competently for any significant period of time after his alleged onset date.

13

Therefore, it does not necessarily follow that initially being hired as a ride operator is incompatible with his alleged level of impairment. The ALJ made some attempt to develop the record concerning this ambiguity during the administrative hearing, but seemingly ignored the information that was obtained from Plaintiff and determined that Plaintiff was still working as a ride operator on the date of decision. The ALJ accepted Plaintiff's statements that he worked as a ride operator but did not consider the context of that statement as well as all explanations and descriptions of what working as a ride operator meant.[5] The ALJ further did not consider Plaintiff's earning reports, which show he earned nothing in 2012 and 2013. Substantial evidence does not support a finding that Plaintiff was working as a ride operator on the decision date.

Second, the ALJ determined that Plaintiff's objective medical record does not support Plaintiff's claimed level of pain because he was only being treated with oxycodone and received neither injections nor physical therapy. According to the ALJ, Plaintiff's consistent course of treatment shows that his pain is well controlled with medication. Plaintiff, however, has consistently reported pain throughout the record and alleges significant functional limitations due to that pain as well as his physical injuries. This pain has a clearly established cause in the record, his primary care physician referred him to a pain clinic as well as an orthopedist, and he has consistently been prescribed narcotic pain medication. (R. 397). Moreover, on the one occasion within the record in which Plaintiff was not being treated with narcotic pain medication he fell to the floor in pain and suffered spasms.

Over the span of this claim, Plaintiff's pain medication increased to and stayed at 30mg Oxycodone four times a day p.r.n. (R. 482). The ALJ considers this a conservative course of

---

[5] The ALJ made a general credibility finding that Plaintiff's level of activity was inconsistent with his alleged limitations. This credibility determination cannot encompass the prior finding that Plaintiff is not credible when he says he quit working and his earning reports show no income for the past several years. In fact, the finding that Plaintiff is still working partially forms the basis for discrediting Plaintiff generally.

treatment, but does not offer what dosages or narcotics would be a high enough grade as not to discredit Plaintiff's subjective claims of pain. The ALJ gives some guidance regarding what kind of pain management treatments would be considered consistent with allegations of pain by specifically stating that a lack of injection or physical therapy calls into question Plaintiff's level of pain.[6] (R. 27). Nevertheless, the ALJ recognizes that Plaintiff went to physical therapy after his surgery, and Plaintiff was referred to an orthopedist. (R. 28). Physical therapy was not helpful for Plaintiff.[7] The ALJ further recognized that Plaintiff stated he has difficulty affording medication, and Plaintiff testified that he has been recommended for therapy and injections per his referral to a "spine doctor." (R. 52). Plaintiff also testified that his doctor has discussed back surgery with him. (R. 62). The ALJ made no finding concerning how Plaintiff's lack of resources may impact the negative inference that Plaintiff's conservative course of treatment belies his subjective claims. If Plaintiff is following a conservative course of treatment because he lacks medical access, the course of treatment is not a basis for discrediting his subjective claims. Given the evidence in the record that Plaintiff had been recommended for less conservative treatment as well as Plaintiff's statement that he could not pursue those treatments due to financial limitations, the negative inference is not warranted and constitutes error.[8] See *Henry v. Commissioner of Social Sec.*, 802 F.3d 1264, 1268 (11th Cir. 2015) (finding error where ALJ drew negative inference from claimant's conservative course of treatment where Plaintiff stated he could not afford continued treatment and ALJ failed to develop the record).

---

[6] Plaintiff consistently alleged that his pain is constant, medication relieves the pain somewhat, and medication only lasts a few hours. (R. 293, 297, 338, 335). The records from Dr. Garner do not state how well oxycodone was managing Plaintiff's pain, but Plaintiff testified at the hearing that his pain is usually a three or four after he takes medication. (R. 49).

[7] The ALJ's further determination that Plaintiff's "normal" blood pressure level during "his examinations" is inconsistent with pain is not supported by the record, science, or medicine.

[8] The ALJ found "the claimant admitted that he smokes a pack of cigarettes every two days, which is a costly habit and which indicates some discretionary income that could be used to treat disabling mental health symptoms." (R. 27). There is no mention of Plaintiff's ability to afford specialist orthopedic treatment or other narcotics for pain management.

As noted above, Plaintiff fell off a roof or ladder in 2013 while he was attempting to perform work. Plaintiff clearly testified at the hearing that he never made it onto the roof because he fell off the top of a ladder. (R. 58). The ALJ's treatment of this incident is vague and inconsistent. The decision states that this incident suggests that Plaintiff can perform light work, but the RFC states that Plaintiff cannot perform any climbing of ladders. (R. 24). Thus, the ALJ found that Plaintiff attempted to perform work beyond his capabilities and failed. An inference that this failure suggests the ability to perform light work[9] is unwarranted.

Plaintiff presented clear objective medical evidence regarding his limitations and pain. He clearly established that he has multiple injuries and conditions ranging from a deformed, shortened, and atrophied leg to fat compressing nerve roots in his back. Plaintiff has consistently alleged that these injuries are not well managed by pain medication and combine to prevent him from working. He has been referred to specialists and his physical capabilities have been questioned by multiple doctors. Plaintiff is entitled to have this evidence properly weighed and considered according to established procedural standards. The ALJ did not properly weigh this evidence or follow procedure. Instead, the ALJ fed the finding that Plaintiff is not credible back into the evidence and discarded anything incompatible with the RFC narrative. See *Bright-Jacobs v. Barnhart*, 386 F.Supp. 1295, 1300 (N.D. Ga. 2004) ("it is the adjudicator's duty to investigate the facts and develop the arguments, both for and against granting benefits.") (internal string citation omitted). The ALJ's decision is not supported by substantial evidence.

c. *Duty to Develop the Record*

Finally, Plaintiff argues that he is was entitled to have the ALJ order an orthopedic consult to determine what effects his 2013 fall had on his functional capabilities. Plaintiff asserts that the fall adversely affected the pre-existing conditions discussed above. Plaintiff additionally

---

[9] Light work may require "a good deal of walking or standing."  20 C.F.R. § 404.1567(b)

16

points out that he suffered severe and potentially life changing trauma due to the fall, including bilateral arm fractures, five broken ribs, and a punctured lung. (R. 369).

"It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (citing *Ford v. Secretary of Health and Human Services*, 659 F.2d 66, 69 (5th Cir. 1981). In this case, a significant medical event intervened between Plaintiff's previous consultative exam and the date of the ALJ's decision which could have significantly diminished Plaintiff's functional abilities. Plaintiff's counsel naturally requested an additional consultative exam, and multiple strong reasons exist suggesting that an additional consultative examination would have been helpful in this case. Plaintiff is not entitled to an orthopedic consult on this basis, however, because an ALJ has no duty to develop the record for the period after a claimant has filed for disability. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); see also *Smith v. Commissioner of Social Security*, 501 F. App'x 875, 878 (11th Cir. 2012) (rejecting Plaintiff's argument that ALJ should have ordered a consultative examination concerning claimant's condition for the period after the filing date because "the ALJ was only obligated to develop a medical record for the twelve months preceding the filing of [claimant's] application for benefits")

Although Plaintiff's 2013 fall provides no basis for error in the ALJ's decision to refuse to order an orthopedic consult because it occurred after Plaintiff's filing date, it may have been error for the ALJ to fail to order a consult on the facts of this case. As noted above, Plaintiff's Primary Care Physician referred Plaintiff to an orthopedist, the ALJ discredited both consulting evaluations in the record partially because they failed to give a clear indication regarding Plaintiff's level of physical impairment, and the ALJ was unable to assign weight to any

evaluation of Plaintiff's physical abilities. It is not at all clear that the ALJ will be able to make an informed decision or not without an additional consultative examination. Therefore, the Court declines to recommend that the commissioner be directed to order an orthopedic consult, but notes that the duty may arise when the record is considered on remand. See *Cowart v. Scheweiker*, 662 F.2d 731 (11th Cir. 1981).

## CONCLUSION

After a careful review of the record, it is **RECOMMENDED** that the Commissioner's decision be **REMANDED** pursuant to sentence four. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, WITHIN FOURTEEN (14) DAYS after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO ORDERED**, this 25th day of March, 2016.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge